FILED
2005 Aug-25  PM 03:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA JASPER DIVISION

| | |
|---|---|
| ANNE LAURA (ANNE) THOMPSON | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) Case No.: CV-01-1223-VEH |
| | ) |
| LOONEY'S TAVERN PRODUCTIONS, | ) |
| INC., et. al. | ) |
| | ) |
| **Defendants.** | ) |

## Memorandum of Opinion

## I.    INTRODUCTION AND PROCEDURAL HISTORY

This is a civil action filed on May 11, 2001, by the Plaintiff, Anne Laura Thompson, against the Defendants, Looney's Tavern Productions, Inc. ("Looney's"), Free State of Winston Heritage Association, Inc. ("Free State"), Lanny McAlister, Jenny Mac Productions, Gary Goch, Joseph Cohen, Chester McKinney, and Magnolia Enterprises.  The original Complaint alleged that the Plaintiff and her sister, Mary Yarbrough, are the owners "of all copyrights to the books <u>Tories of the Hills</u>, <u>Free State of Winston</u>, and <u>So Turns the Tide</u>, written by their father, Wesley S. Thompson.  The Complaint alleges that

> Defendants Looney's, McAlister, Jenney Mac Productions, Free State
> . . ., Goch, Cohen, . . . McKinney [and] Magnolia Enterprises have
> knowingly, willfully, intentionally and maliciously engaged in a
> campaign to infringe Thompson's copyrights in three of his books, have

committed acts of unfair trade practices and unfair competition by the unauthorized appropriation of Thompson's books and the good will associated therewith, all of which are proprietary to Thompson as set forth herein, and defendants are continuing to do so, and preparing for further infringement by filming and producing a movie, all to the commercial gain, personal profit, and unjust enrichment of the defendants and the irreparable injury and financial loss of Thompson.

*Complaint*, at 5.

The original Complaint alleges Four Counts. Count 1 alleges a claim for Copyright Infringement which appears to be brought only against Defendants Looney's, McAlister, Free State, Goch, McKinney, and Magnolia Enterprises. The next claim is one for Breach of Contract brought against Looney's, McAlister and Free State. It is a separate count, but is not specifically designated as Count 2. Count 3 (incorrectly designated as Count 2) alleges Unfair Trade Practices, Unfair Competition, and Misappropriation. This Count seems to be alleged against all Defendants. Count 4 (incorrectly identified in the Complaint as Count 3) alleges State Law Unfair Trade Practices and Unfair Competition claims against Defendants Looney's and McAlister.

On May 21, 2001, the Plaintiff filed her First Amendment to the Complaint adding to the caption of the Complaint the names of all Defendants named in the body of the Complaint. Doc. 6.

On August 31, 2001, in response to Court orders requiring her to file a more

2

definite statement, the Plaintiff filed a Supplemental and Amended Complaint.  Doc.

62.

Defendants McAlister and Jenny Mac were dismissed by Order of this Court

on September 27, 2001.  Doc. 73.  Except for breach of contract claims against

Looney's for failure to pay royalties, Defendants Looney's, Free State, Goch, and

Cohen were dismissed by Order of this Court on October 2, 2001.  Doc. 83.  That

Order was certified as final on October 10, 2001.[1]  Doc. 92.

On October 11, 2001, this Court denied the Plaintiff's motion to file a Second

Amended and Supplemental Complaint.  Doc. 93.  On October 26, 2001, the Plaintiff

filed a notice of appeal from both doc. 73 and doc. 83.  On December 3, 2001, the

Plaintiff filed a Rule 60(b)(1) Motion to Alter, Amend, and Vacate the September 27,

2001, Order.  Doc. 114.  On December 12, 2001, this Court certified the September

27, 2001, Order as final, but denied the remainder of the Plaintiff's Rule 60(b)

motion.  Specifically, the Court wrote: "Defendant [sic] McAlister and JennyMac

Productions remain DISMISSED WITH PREJUDICE."  Doc. 120.

On December 12, 2001, the Plaintiff filed a Rule 60(b)(1) Motion to Alter,

Amend or Vacate, the October 2, and October 10, 2001, Orders.  Doc. 122.  This

---

[1]In that same order, the Court noted the voluntary dismissal of Looney's Counterclaim.

Court entered an Order on December 21, 2001, purporting to grant that motion.[2]  Doc. 123.

On January 11, 2001, the Plaintiff filed a Notice of Appeal of doc. 20, the Court's Order of December 12, 2001.  Doc. 124.

On January 24, 2002, the Court of Appeals issued the following decision:

> The Court notes that on December 21, 2001, the District Court granted Appellant's Rule 60(b) motion.  Although the District Court lacks jurisdiction to grant the motion, the Court construes the District Court's Order as certification that, if this matter were remanded, it would grant Appellant's motion.  Accordingly, this matter is REMANDED IN FULL to the District Court.

Doc. 130.  This decision dealt only with the original appeal from the October 2, and October 10, 2001, Orders.  On January 29, 2002, the Court of Appeals dismissed the original appeal from the September 27, 2001, Order due to lack of jurisdiction since, at the time of the appeal, the Order was not certified as final.

On March 14, 2002, this Court vacated the October 2, and October 10, 2001, Orders.  Doc. 140.

On June 28, 2002, this Court granted the Plaintiff leave to file a "Third Supplemental and Amended Complaint."  Doc. 176.  This Complaint is brought against the following Defendants: 1) Looney's, 2) Posey, both individually and in his

---

[2]The Court was without jurisdiction to do so at the time because the Order had been appealed.

official capacity as Looney's CEO, 3) Free State, 4) Gary Goch, 5) Magnolia Enterprises, and 6) Joseph Cohen. This Complaint alleges Copyright Infringement (Count 1) against Defendants Looney's, Posey, Free State, Goch, Magnolia Enterprises, and Cohen. Count 2 alleges Breach of Contract of a 1995 Settlement Agreement[3] against Defendant Looney's. Count 3 alleges Unfair Trade Practices, Unfair Competition, Deceptive Trade Practices, Misappropriation, False Designation, and Damage to Integrity against Defendants Looney's, Posey, Goch, Cohen, Free State, and Magnolia Enterprises (violations of RICO and the Lanham Act). Count IV[4] is entitled "State Law Claims–Unfair Trade Practices and Unfair Competition and Deceptive Trade Practices." Count 5 requests Declaratory Relief. Count 6 requests that the Court set aside the 1995 Settlement Agreement. Count 7 alleges Fraudulent Concealment against Defendants Looney's, Posey, Goch, and Cohen. Count 8 alleges Looney's and Free State failed to account for proceeds. Count 9 alleges misconduct on the part of Looney's in mediating the 1995 Settlement. Count 10 requests injunctive relief to prevent the Defendants from disbursing funds. Count 11 recites the Plaintiff's damages allegations.

On July 19, 2002, the Court of Appeals vacated and remanded the order

---

[3]A previous lawsuit, discussed in more detail below, was filed by the Plaintiff and her sister in 1994, against Defendant Looney's and settled in 1995.

[4]The Complaint changes from Arabic to Roman numerals for this Count only.

dismissing Defendants McAlister and Jenny Mac. Doc. 233. Specifically, the Court of Appeals noted that the district court gave no reasons for its holdings, and held: "We therefore vacate the dismissal of these defendants and remand so that the district court can provide further explanation for its ruling."

On September 9, 2002, in favor of Defendants Looney's, Free State, Goch, Cohen, and Posey, this Court dismissed entirely the claims in Count IV, Count 6, Count 9, and Count 10. Doc. 207. In addition, it dismissed all copyright claims that arose before June 28, 1999, as to Posey, and all copyright claims that arose before May 11, 1998, as against Looney's, Free State, and Cohen. Doc. 207.

As to Defendants Looney's, Free State, Cohen, and Posey, that same order dismissed all RICO claims in their entirety, and all Lanham Act claims that arose prior to May 11, 2000. Doc. 207. In addition, it dismissed all Lanham Act claims involving the play "Looney's Tavern: Aftermath and Legacy" as barred by the doctrine of laches. Doc. 207. Regarding Lanham Act claims against Defendant Posey, this Court dismissed all claims which arose prior to June 28, 2001. On December 8, 2004, this Court ruled that "because of subsequent amendments of the Complaint, the specific claims against Defendants McAlister and Jenny Mac Productions have been eliminated. Therefore . . . the claims against these Defendants, as stated in the Original and First Amended Complaint, are hereby **REINSTATED**."

6

Doc. 503.  On January 7, 2005, this Court further held that all claims asserted against Defendants McAlister and JennyMac asserted in the First Amendment to the Complaint, and the Supplemental and Amended Complaints were also reinstated.

Presently before the Court is the Motion for Summary Judgment filed by Defendants Looney's, Free State, Goch, Cohen, and Posey.  Doc. 321.  Also, before the Court is the Motion for Summary Judgment filed by Defendants McAlister and JennyMac.  Doc.  594.  For the reasons stated herein, the motions will be **GRANTED**, and **JUDGMENT** will be **ENTERED** in favor of these Defendants.

## II.    SUMMARY OF PLAINTIFF'S CLAIMS AND THE CLAIMS THAT HAVE BEEN DISMISSED[5]

### A.    Plaintiff's Copyright Infringement Claims

Count I of Plaintiff's Third Supplemental and Amended Complaint alleges that the following works infringe the books <u>Tories of the Hills</u>, <u>So Turns the Tide</u>, and <u>Free State of Winston - A History of Winston County Alabama</u> (collectively referred to as the "Copyrighted Works"):

1.    Scripts and performances in 1996, 1997, 1998, and 1999 of the play

---

[5]"Dismissed" claims do not include claims as to McAlister and JennyMac.  For the same reasons stated in Judge Bowdre's Order of September 9, 2002, the same dismissed claims mentioned herein will also be dismissed against McAlister and JennyMac.  *See Section VI infra.*

"Looney's Tavern: the Aftermath and the Legacy";[6]

2.      Scripts and performances in  2000, 2001, and 2002 of the play, "The

        Incident at Looney's Tavern"; and

3.      The "Freedom Run" screenplay.

In its Order of September 9, 2002, the Court dismissed all copyright claims that

arose before May 11, 1998, and the copyright claims against Jim Posey that arose

prior to June 28, 1999.

**B.      Plaintiff's Breach of Contract Claims**

Count II of Plaintiff's Third Supplemental and Amended Complaint alleges

that Looney's Tavern breached the 1995 Settlement and Release Agreement in the

following ways:

1.      Making preparations for a movie when movie rights to Tories of the

        Hills is reserved to Plaintiff;

2.      Generating and performing "Looney's Tavern: The Aftermath and the

        Legacy" from 1996-1999 when sequel rights and dramatic rights to

        Tories of the Hills is reserved to Plaintiff;

---

[6] Although very similar to the 1996-1997 scripts, the 1998 play script is entitled
"Looney's Tavern: The Aftermath."  The 1998 and 1999 plays were promoted under the title
"Looney's Tavern: The Legacy."  For consistency, the 1996-1999 plays will be referred to as
"Looney's Tavern: The Aftermath and The Legacy."

3.    Failing to pay Plaintiff and her sister (Mary Alice Yarbrough) 2% royalties of gross ticket sales for performances of "Incident at Looney's Tavern";

4.    Failing to keep full and correct books relating to performances of "Incident at Looney's Tavern"; and

5.    Transferring to Free State the non-exclusive license obtained pursuant to the 1995 Settlement and Release Agreement.

**C.    <u>Plaintiff's Lanham Act Claims</u>**

Plaintiff claims in Count III of her Third Supplemental and Amended Complaint that Defendants have violated § 43(a) of the Lanham Act in the following ways:

1.    Passing off McAlister as the author, creator, and researcher of the play "Looney's Tavern: the Aftermath and the Legacy" rather than attributing credit to Wesley Thompson, author of the Copyrighted Works;

2.    Implying Wesley Thompson's endorsement for the play "Looney's Tavern: The Aftermath and the Legacy";

3.    Passing off McAlister and Goch as the authors of the screenplay "Freedom Run" rather than attributing credit to Wesley Thompson, author of the Copyrighted Works;

9

4.     Marketing the "Freedom Run" screenplay as if Defendants owned all rights to the screenplay; and

5.     Disparaging the good name of Wesley Thompson by performing trite plays that the public associates with Thompson.

In its Order of September 9, 2002, the Court dismissed all Lanham Act claims that arose prior to May 11, 2000, and the Lanham Act claims against Jim Posey that arose prior to June 28, 2001.

### D.    <u>Plaintiff's Declaratory Relief Regarding Movie</u>

In Count 5 of her Third Supplemental and Amended Complaint, Plaintiff seeks declaratory relief that if Defendants produce a movie based in any way on "Incident at Looney's Tavern" or the Copyrighted Works that Defendants will owe punitive damages.

### E.    <u>Plaintiff's Fraudulent Concealment Claims</u>

Plaintiff claims in Count 7 of her Third Supplemental and Amended Complaint that Looney's Tavern, Posey, Goch, and Cohen fraudulently concealed the existence of the screenplay during the 1994-1995 lawsuit.

### F.    <u>Plaintiff's Claims For Failure To Account For Proceeds</u>

Plaintiff claims in Count 8 of her Third Supplemental and Amended Complaint that Looney's Tavern and Free State have refused to account for proceeds to the

plays.

G.    **Plaintiff's Damage Claims**

In Count 11 of her Third Supplemental and Amended Complaint, Plaintiff

seeks the recovery of damages for the Counts set out above.

III.    **FACTS**

The facts will be cast, as this Court must, in the light most favorable to the non-

moving party.  However, it is important to note that the facts cited by the Defendants

in their briefs contained extensive and clear citations to the record, often with page

and line numbers.  Almost all of the Defendants alleged facts were disputed by the

Plaintiff.  The Court, as is its charge when a fact is disputed, carefully examined each

and every one of statements of facts and supporting citations of the Defendants.  The

Court then examined the specific dispute the Plaintiff had with the statement, *and the*

*evidence cited in support thereof.*  In almost all cases where the Plaintiff disputed a

fact alleged by the Defendant, she either failed to cite *any* evidence, or made an

argument completely off point.  Where the Plaintiff did cite evidence in support of her

dispute it was either evidence that was not included with her Summary Judgment

submission,[7] did not support her assertions, or supported an assertion not on point.

---

[7]This was in violation of this Court's scheduling order, and subsequent orders allowing
her to supplement her submissions.

11

Plaintiff's generalized assertions at this stage does not preclude summary judgment.  "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1989).  Furthermore, Fed. R. Civ. P.56(c) "saddles the non-movant with the duty to 'designate' the specific facts in the record" supporting her claim.  *Jones v. Sheehan, Young & Culp*, *P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996).  "Rule 56 . . . does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." *Id.*; *see also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.) (*en banc*) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), *cert. denied*, 516 U.S. 817 (1995).

Furthermore, in the Plaintiff's opportunity to respond to McAlister and JennyMac's Motion for Summary Judgment in particular, the Plaintiff provides no cites to documents properly before the Court, or properly designated.  The Plaintiff mostly makes a number of conclusory allegations followed by citations such as "Exhibit ____" with the "blank" left empty.

In addition, the Court notes (as the Plaintiff has) that McAlister and JennyMac's brief in support of their Motion for Summary Judgment is basically a

"carbon copy" of the previous brief filed months ago by the other Defendants in this matter on their Motion for Summary Judgment.  Accordingly, the Plaintiff has had two opportunities to rebut the same factual assertions and arguments with facts of her own.  For the second time, the Plaintiff failed to do so.

The Plaintiff is an educated person.  A "PhD" no less.  In addition, this is not the case of the unwary *pro se* litigant being caught off guard by *foreign* procedural or evidentiary rules too "baffling" for a lay person to understand.  To the contrary., this is a case where the Plaintiff was simply required to provide and cite to evidence in opposition to Summary Judgment.  She was given explicit instructions regarding same.  She has just failed to do so–twice.

Despite the charge to cast the facts in the light most favorable to the non-movant, where the non-movant provides no evidence, or citations to evidence, the Court cannot cast facts in her favor.

### A.    Registration and Ownership of Copyrighted Works

Plaintiff and her sister, Mary Alice Yarbrough ("Yarbrough"), are the co-owners of the copyright rights to the books, Tories of the Hills, Free State of Winston – A History of Winston County Alabama, and So Turns the Tide ("Copyrighted Works").  *Thompson Dep.,* at 60. *Yarbrough Affidavit* at ¶ 1.  The rights to the Copyrighted Works passed to Plaintiff and Yarbrough either directly after their father,

Wesley Thompson (the "author" of the Copyrighted Works), died or to Letha Thompson (Plaintiff's mother) and then to Plaintiff and Yarbrough upon her death. *Thompson Dep*. at 59-62.

### 1.   Tories of the Hills

Christopher Publishing House registered Tories of the Hills with the U.S. Copyright Office as the copyright claimant and listed Wesley Thompson as the sole author. *Tories of the Hills Copyright Registration*, at 1.

Tories of the Hills is described in its Foreword as a "historical novel" concerning the "strife in the hills of north [sic] Alabama during the War Between the States" that is "definitely more factual than fictional" and that "follows closely the tragical pattern of life during the war" and the "fiction parts conform admirably to historical perspective." *Tories of the Hills*, at 7.  The book has not been reprinted since 1993. *Thompson Dep.,* at 22.  Since it was first published in 1953, Plaintiff estimates between 8,000 and 16,000 copies have been sold.  *Id.* at 26-27.

In a previous lawsuit concerning this work, the following interrogatory was submitted and  answered as follows:

13.    State each and every portion of the Book that was originally authored by Wesley Thompson.

ANSWER: Plaintiffs contend that the entire Book, including but not limited to fictional characters, dialogue, conversations [sic] arrangement

> of facts, and story are original expressions of Thompson.  Plaintiff's
> claim no copyright in historical facts, geographic locations, and a small
> portion of speeches from the Alabama Secession Convention, but
> plaintiffs contend that Thompson's original expression of said facts,
> geographic locations and convention speeches are original to Thompson.
> Plaintiffs also claim joint ownership, with Judge Weaver, to certain
> passages referring to the resolutions allegedly recited at the convention
> at Looney's Tavern.

*Answers to Defendant's First Interrogatories in CV-94-B-2534-J*, at 7.  In his

deposition, Judge Weaver's son, Sam Weaver, testified that Wesley Thompson and

Judge Weaver were close friends.  *Weaver Dep.*, at 6, 15.  Wesley Thompson visited

with Judge Weaver between twenty and thirty times for between an hour and a half

and two hours.  *Id.* at 32.  During those meetings, Judge Weaver would tell Thompson

what he knew of the history of Winston County, including such things as the raid on

the jail in Jasper, the killing of Tom Pink Curtis, and the killing of Andrew Kaiser.

*Id.* at 33-34.  After the meetings, Thompson would return the next day, review the

notes he had taken with Judge Weaver, correct them, and get additional information

from Judge Weaver.  *Id.* at 33.  Mr. Weaver testified that the knowledge of the history

of Winston County in <u>Tories of the Hills</u> came from Judge Weaver.  *Id.* at 34.

In the Introduction to <u>Tories of the Hills</u>, the author claims "to having seen and

talked with more persons who were over 100 years than any man living."  *<u>Tories of</u>*

*<u>the Hills</u>*, at 9.  Plaintiff is not aware of any other sources of information for the book.

15

*Thompson Dep*. at 28.

Judge Weaver was author of a pamphlet entitled <u>Facts and Fiction of the Free State of Winston</u> first published in 1950. *Weaver Dep*. at 32. Judge Weaver's pamphlet describes the neutrality meeting resolutions at Looney's Tavern as follows:

1st.   We commend the Hon. Chas. C. Sheets and the other representatives who stood with him for their loyalty and fidelity to the people whom they represented in voting against secession, first, last, and all of the time.

2nd.   We agree with Jackson that no state can legally get out of the union; but if we are mistaken in this, and a state can lawfully and legally secede or withdraw, being only a part of the Union, then a county, any county, being a part of the state, by the same process of reasoning, could cease to be a part of the state.

3rd.   We think that our neighbors in the South made a mistake when they bolted, resulting in the election of Mr. Lincoln, and that they made a greater mistake when they attempted to secede and set up a new government. However, we do not desire to see our neighbors in the South mistreated, and, therefore, we are not going to take up arms against them; but on the other hand, we are not going to shoot at the flag of our fathers, "Old Glory," the Flag of Washington, Jefferson, and Jackson. Therefore we ask that the Confederacy on the one hand, and the Union on the other, leave us alone, unmolested, that we may work out our political and financial destiny here in the hills and mountains of northwest Alabama.

On reading the second resolution, Uncle "Dick" Payne, a Confederate sympathizer, one of the few present, sitting back in the audience made the following remark, "Oh, Oh, Winston secedes!" "The Free State of Winston!"

*Facts and Fiction of the Free State of Winston*, at 7.  <u>Tories of the Hills</u>, published three years later in 1953, contains the almost identical interpretation of the neutrality meeting resolutions.  *Tories of the Hills*, at 46-47.

One of the plots of <u>Tories of the Hills</u> involves a southern belle torn between the love of her father, a Confederate secessionist, and a Union sympathizer. *Thompson Dep*. at 31. The second plot described by Ms. Thompson involves "Chris Sheats going in from his farmhouse home in Houston, talking with the townspeople, like Tom Pink Curtis and/or Uncle Dick Payne and people like that, about the election and the ramifications of it."  *Id.* at 32.

### 2.    The Free State of Winston – A History of Winston County Alabama

Free State of Winston – A History of Winston County Alabama ("<u>Free State of Winston</u>") was first published in 1968, and has probably sold less than 10,000 copies.  *Id.* at 46-47.   In the Foreword and Introduction to the book, Wesley Thompson, the listed author, describes <u>Free State of Winston</u> as a "history," "treatise," and "true account" of Winston County and the surrounding counties. *Free State of Winston,* at v and ix.  The passages of the work cited to the Court read more than anything else like a history–containing factual assertions, with end notes and proper citations to authority.  The author, in the Acknowledgment, gives credit to

17

Judge Weaver "with whom the author has traveled over most of Winston County while he listened to the historian [Weaver] relate the accounts of persons and incidents which had made the county singular and outstanding. . . ." *Id.*, at vii. <u>Free State of Winston</u> also identifies Judge Weaver's <u>Facts and Fiction of the Free State of Winston</u> as Thompson's sources for his depiction of the neutrality convention resolutions and Uncle Dick Payne's retort of "Ho!  Ho!  Winston secedes: The Free State of Winston!  The Free State of Winston!" *Id.* at 3-4, 209. <u>Free State of Winston</u> also includes a chapter on Chris Sheets, whom the author explains is "indispensable" to a historical treatment of Winston and surrounding counties of North Alabama. *Id.* at 114.  Specifically, Mr. Thompson wrote:

> it is understandable that in order to write a treatise which is purported to be a history, there are certain characters and incidents which should be included.  Their relationship and involvement in the course of historical aspects of a culture or a section makes them indispensible.
>
> Such were the characteristics of "Chris Sheats".  He was so inseparably involved in the times, conditions, and circumstances of Winston and surrounding counties of North Alabama during the Civil War as to merit special recognition in a work of this type.

<u>Free State of Winston</u>, at 114.

### 3.   So Turns The Tide

Wesley Thompson, the author of <u>So Turns the Tide</u>, describes the book as "an account of the social and economic conflicts among the wealthy business people and

large plantation owners of the fertile Tennessee Valley." *So Turns the Tide*, at vii.

The author also explains that "this story, like <u>Tories of the Hills</u>, is based largely upon

actual persons and events, many of which are subject to documentation; the others are

definitely more factual than fictional." *Id.* The author also notes that "because of its

location with respect to the setting" of <u>Tories of the Hills</u>, "there are many similar

characters and events." *Id.* Since first published in 1965, less than 5,000 copies of

<u>So Turns the Tide</u> have been sold. *So Turns the Tide Copyright Registration*, at 1;

*Thompson Dep*. at 57-58.

### B. Pre-Settlement And Release Agreement Activities From 1989-1995 By Defendants

Beginning in 1989, Looney's Tavern began producing and performing the play

"Incident at Looney's Tavern." *Moody Affidavit*, at ¶ 2. The play is based on the

historical, true story account of Winston County (and surrounding counties) during

the Civil War. *Id.* According to Dwain Moody, the president of Looney's Tavern

Productions, during the Civil War, a large number of Winston County residents were

opposed to joining the Confederacy and wanted to remain loyal to, and part of, the

Union. *Id.* Mr. Moody testifies that the original script to "Incident at Looney's

Tavern" was written by Lanny McAlister. *Id.* at ¶ 3; *McAlister Affidavit*, at 2.

"Incident at Looney's Tavern" was produced and performed by Looney's

Tavern from 1990 through 1995 in Looney's Tavern's outdoor amphitheater in Double Springs, Alabama. *Moody Affidavit*, at ¶ 3; *McAlister Affidavit,* at ¶ 2. The scripts of the plays from 1989-1995 were identical in all material respects, with only minor changes being made from year to year. *Moody Aff.* at ¶ 3; *McAlister Deposition,* at 59-61.

In 1991 or 1992, McAlister and Gary Goch wrote a screenplay entitled "Freedom Run" *McAlister Aff.,* at ¶ 4. Mr. McAlister states that the screenplay was also based on the true story account of Winston County (and surrounding counties) during the Civil War. *Id.* He also testified that, except for one possible passage, none of the "Freedom Run" screenplay was arguably copied from, is substantially similar to, or relied upon, any protectable subject matter from the Copyrighted Works. *Id.* at ¶ 5. A number of contracts related to the "Freedom Run" screenplay were entered into in 1992, with the last contract providing for a joint venture between Looney's Tavern and Avalon Films, with Avalon Films being a joint venture between Gary Goch and Magnolia Enterprises. *Joint Venture Agreement of Free State Productions*, at 1.

It is undisputed that, in 1994, Plaintiff and her sister, Mary Alice Yarbrough, filed a copyright infringement and unfair competition lawsuit against Looney's Tavern and McAlister. The plaintiffs in that case asserted that the play "Incident at

Looney's Tavern" infringed the book <u>Tories of the Hills</u> and that Looney's Tavern passed off the play as written by Lanny McAlister when it was Wesley Thompson's story. *Thompson Dep*., at 80-82. The Plaintiff became aware of the movie plans in 1992. *Id.* at 224-225. Indeed, an additional purpose of the 1994 lawsuit was to prevent Looney's Tavern from proceeding with the movie plans. *Id.*

The 1994-1995 lawsuit was settled pursuant to a Settlement and Release Agreement between Looney's Tavern, Lanny McAlister, Plaintiff, and Mary Alice Yarbrough *1995 Settlement and Release Agreement*, at 1. In the 1995 Settlement and Release Agreement, the parties acknowledged that there was no admission of liability and that the settlement simply prevented further involvement in protracted litigation. *Id.* In the Settlement and Release Agreement, Looney's Tavern received a license to use in future scripts and performances any portions of the book <u>Tories of the Hills</u> in the 1989-1995 scripts to "Incident at Looney's Tavern". *1995 Settlement and Release Agreement,* at ¶1(c); *Yarbrough Affidavit*, at para 2. The Settlement and Release Agreement reads, in pertinent part, as follows:

> (c) Thompson and Yarbrough grant to Productions and McAlister in perpetuity the non-exclusive right to use portions of the book ("Tories of the Hills") as set forth in the 1989 through 1995 scripts of the Play as written by McAlister and produced by Productions. Thompson and Yarbrough hereby reserve to themselves, including but not limited to, dramatic, all print publication, radio, television, cable, pay television, motion picture, photoplay, sound recording, "live" broadcast and

transmissions, sequel and serial rights in and to the Book.

*1995 Settlement and Release Agreement,* at ¶1(c). In return, Plaintiff and Mary Alice Yarbrough were entitled to two percent (2%) of gross ticket sales for performances of "Incident at Looney's Tavern." *1995 Settlement and Release Agreement,* at ¶1(b). The parties also included a mutual release for any and all existing claims, known and unknown. *1995 Settlement and Release Agreement,* at ¶ 2. That language provides:

> (e) Any script changes relative to the Play [, "Incident at Looney's Tavern,"] that incorporates additional material from the Book that did not appear in the 1989 through 1995 scripts of the Play shall be presented to the plaintiffs' attorney for Thompson and Yarbrough's consent, said consent shall not be unreasonably withheld.[8]

*Id.* at ¶ 1(e).

## C.    <u>Approval of 1996 Script</u>

Contemporaneously with execution of the Settlement and Release Agreement, Looney's Tavern engaged McAlister to author a sequel to the original play "Incident at Looney's Tavern" without any expression from the Copyrighted Works. *Agreement Between Lanny McAlister and Looney's*, at ¶ 4-5. In accordance with that

---

[8]The Plaintiff mentions, but does not properly cite, attach, or include, unpublished an Eleventh Circuit Court of Appeals opinion from another case in which she claims that Court *held* that "any script changes required the Thompson's approval." The Court was unable to locate the case via a search of the Eleventh Circuit database. Based on the Court's recollection, however, this case has come up previously in this matter. When it did, it was determined that the Eleventh Circuit's statements on this issue were dicta. For these reasons, the Court will not address the Eleventh Circuit's ruling alluded to by the Plaintiff.

agreement, McAlister wrote a new play in 1996, entitled "Looney's Tavern: the Aftermath and the Legacy,"  based on the historical, true story account of Winston County and the surrounding counties during the Civil War.  *McAlister Aff.* at ¶ 7.

On April 4, 1996, the new script was sent by Looney's Tavern's counsel, Frank Caprio, to Plaintiff's counsel, Eveline Davis & Phillips, for review by Plaintiff and her sister, Mary Alice Yarbrough.  *April 4, 1996, Letter from Caprio to Eveline*, at 1. The Plaintiff received a copy of this letter, with the script attached.  *Thompson dep.*, at 106-107.  That script has been submitted into evidence by the Defendants and identified by the Plaintiff as the script she received.

Eveline Davis & Phillips sent Mary Alice Yarbrough a copy of the script and asked her to review it.  *Yarbrough Affid.*, at ¶3.  In her affidavit she testified that she had reviewed the new script carefully, and she agreed with her attorneys' assessment that the play had been written to ensure that no copyright infringement would occur. *Id.* at ¶4.  Mary Alice Yarbrough communicated her conclusions to her attorneys in a letter dated May 23, 1996, that reads in pertinent part:

> I am responding to your request that I review REVISIONS/SEQUEL TO LOONEY'S TAVERN.  I have carefully read the revisions and agree with your assessment that the play has been rewritten to ensure that no copyright infringement is occurring.  In fact, this version bears little relationship to the original one; this is more trite and "light weight."

*May 23, 1996, Letter from Yarbrough to Eveline*, at 1.

23

Packard Phillips, an attorney with Eveline Davis & Phillips, called Frank Caprio, counsel for Looney's Tavern, indicating that there was no problem with the revised script, and stating that in their opinion, there was no new material from the underlying book and therefore no formal response was needed. *Phillips Aff.* at ¶ 2.[9]

D.    **1996 Script and Performances of "Looney's Tavern: The Aftermath and the Legacy"**

In 1996, Looney's Tavern produced and performed the new play entitled "Looney's Tavern: the Aftermath and the Legacy." *McAlister Aff.* at ¶ 12.  The play was directed by McAlister and he states that the play performances followed the script with only minor deviations. *McAlister Aff.* at ¶¶ 9 and 13; *McAlister Dep.* at 75.   Looney's Tavern paid McAlister as director and paid the cast members. *McAlister Aff.* at ¶ 12.  Looney's was also responsible for providing the facilities, sets, and costumes. *Id.*  McAlister was responsible for selecting the actors and actresses and managing the day-to-day activities of the performances. *Id.*

Mr. McAlister testified that the 1996 play script of "Looney's Tavern: The

_____

[9]Mr. Phillips does not testify to having personally spoken to the Plaintiff or her sister about whether the new script was infringing.  While he states that his partner, Mr. Eveline, told him that he had spoken with them and that they agreed it was not infringing, there is no evidence cited that any communication occurred with the Plaintiff.  No testimony of Mr. Eveline appears in the record.  To the extent that the Affidavit of Packard Phillips recounts his discussion with Mr. Eveline, and Eveline's discussion with the Plaintiff and her sister, it is inadmissible and therefore will be **STRUCK**.

Aftermath and the Legacy" was an original composition and that none of the 1996 script copied protectable subject matter from the Copyrighted Works nor were the Copyrighted Works reviewed, consulted or read while the script was written.[10]  *Id.* at ¶ 8.  Plaintiff attended performances of the play in 1996, but did not inform anyone at Looney's Tavern that she thought the play infringed the Copyrighted Works. *Thompson Dep.* at 107.  She does, however, testify that after reading the script she told Mr. Eveline that she felt the new play infringed on the copyright.[11]  *Id.* at 107.

### E.   1997 Script and Performances of "Looney's Tavern: The Aftermath and the Legacy"

"Looney's Tavern: The Aftermath and the Legacy" was also performed in 1997.  *McAlister Aff.* at ¶ 12.  The play was directed by McAlister.  *Id.* at ¶ 9.  The 1997 script was substantially the same as the 1996 script.  *McAlister Dep.* at 73-74. The only changes related to lines ad-libbed by the narrator during the 1996 play that McAlister decided to make permanent additions to the 1997 script.  *Id.* at 73-74.  The play performances followed the scripts with only minor deviations.[12]  *McAlister Aff.*

---

[10]The Plaintiff disputes this point and does cite evidence in her response.  However, none of the evidence cited bears on the specific issue addressed by the Defendants.  Instead, it deals with whether McAlister had "access" to the copyrighted works during this time period.

[11]Again, the Plaintiff cites evidence in a purported attempt to dispute the Defendant's assertion here.  However, the citations are either to evidence that is either not included in her submission, or not on point.

[12]The Plaintiff disputes this point without reference to specific page numbers in McAlister's deposition, and with reference to videos and audio tapes which have been struck.

at ¶ 13; *McAlister Dep.* at 75.  Looney's Tavern paid McAlister as director and paid the cast members.  *McAlister Aff.* at ¶ 12.  Looney's was also responsible for providing the facilities, sets, and costumes.  *Id.*  McAlister was responsible for selecting the actors and actresses and managing the day-to-day activities of the performances.  *Id.*

McAlister testified that the play script was an original composition and none of the play script was copied from, is substantially similar to, or relied upon any protectable subject matter from the Copyrighted Works.  *McAlister Aff.* at ¶ 8.

**F.   1998 Script and Performances of "Looney's Tavern: The Aftermath and the Legacy"**

In 1998, minor revisions were made by Lanny McAlister to the 1996-1997 script for "Looney's Tavern: the Aftermath and the Legacy."  *Id.* at ¶ 10.  The revised play was performed in 1998.  *Id.* at ¶ 12.  The 1998 play was substantially the same as the 1996-1997 play, with only minor revisions to improve the flow and dialog in the script.  *Id.* at ¶¶ 10-11.  The 1998 script includes the same scenes, follows the same sequence of events, and has the same theme, mood, and plot as the 1996 script. *Id.* at ¶ 11.  The play performances followed the scripts with only minor deviations. *McAlister Aff.* at ¶ 13; *McAlister Dep.* at 75.  Looney's Tavern paid McAlister as director and paid the cast members. *Id.* at ¶ 12.  Looney's was also responsible for

26

providing the facilities, sets, and costumes. *Id.* McAlister was responsible for selecting the actors and actresses and managing the day-to-day activities of the performances. *Id.*

Mr. McAlister testified that none of the play script was copied from, is substantially similar to, or relied upon any material from the Copyrighted Works. *Id.* at ¶ 11.)

### G.   1999 Script and Performances of "Looney's Tavern: The Aftermath and the Legacy"

Keith Hager ("Hager") was hired by the Board of Directors to be the director of the performances of "Looney's Tavern: The Aftermath and the Legacy" in 1999. *Hager Dep.* at 11, 37. Hager was an actor in the 1996 play and an actor and assistant director in the 1997 play, "Looney's Tavern: The Aftermath and the Legacy," performed at Looney's Tavern Entertainment Park. *Id.* at 7. Hager was paid by Looney's Tavern. *Id.* at 21. Hager was not supervised by Free State of Winston Heritage Association while a director in 1999. *Id.* at 18.

Although no Looney's Tavern personnel requested that Hager make changes to the existing scripts, Hager made a few minor alterations on his own. *Id.* at 16-17. The changes had to be approved by the Board of Directors. *Id.* at 17. The 1999 script used the 1997 script, with the following change:

1)      Page 26 of the 1997 script - Jail in Jasper scene was deleted and an

original song written by Hager, "One Night Alone Forever," using a

split stage with two actors (with no dialog) was inserted.  *Id*. at 23-24,

38.[13]

Hager has never seen any of the Copyrighted Works.  *Hager Dep*. at 31.[14]

## H.      2000 Script and Performances of "Incident at Looney's Tavern"

Margie Benson was hired by Looney's Tavern as general manager in 1999.

*Benson Aff*. at ¶ 1.  As part of Benson's duties, Benson directed performances of the

play "Incident at Looney's Tavern" during the 2000 season.  *Id.*  Benson was asked

to make some minor modifications to the pre-existing scripts (used from 1989-1995)

to make the play more factually and historically accurate. *Id.* at ¶ 2.  Benson met with

Don Dodd, a noted Winston County historian, who provided her with some additional

historical information related to Winston County during the Civil War.  *Id.*  Minor

modifications were thereafter made by Benson to the preexisting scripts, resulting in

---

[13]The Defendants contend that Hager also testifies to making the following change:

Page 34 of the 1997 script - Hager added a burial scene at the church which
included brief dialog by Hager (as an actor), and recitation of the public domain
song "Rock of Ages, Cleft for Me" and "The Lord's Prayer."

However, the citation to the record they provide does not support this assertion.

[14]Again, the Defendants contend that "No separate 1999 play script existed.  (Hager Dep.
at 35.)" However, the citation they reference is not included in the record.

the 2000 script.  *Id.*  The 2000 script included two new characters, Tillie and Young Jim Bell.  *Id.*  The 2000 script also included a few minor, inconsequential wordsmith changes to the preexisting scripts.  *Id.*  Most of the passages included in the 2000 script correspond to passages in the 1989, 1991, and 1993 scripts.  *Id.* at ¶ 3.  The plays in 2000 were performed in accordance with the scripts.  *Id.* at ¶ 2.

Except for one passage outlined in her affidavit, Ms. Benson testifies that the additions and revisions to the 2000 script were created independently by Ms. Benson, or in collaboration with historical information provided by Mr. Don Dodd, a noted Winston County historian, and none of the revisions added any material to the 2000 script that was copied from, was substantially similar to, or relied upon any protectable subject matter from the Copyrighted Works.  *Id.* at  ¶¶ 3-8.

I.      **2001 and 2002 Scripts and Performances of "Incident at Looney's Tavern"**

The same script was used in 1993, 1994, 2001, and 2002.  *Moody Aff.* at ¶ 3. The plays from 2001-2002 were performed in accordance with the script being used for that year.  *Id.* at ¶ 14.

J.      **Payment of Royalties Due Plaintiff From Gross Ticket Sales For Performances Of "Incident At Looney's Tavern"**

After the settlement agreement in 1995, "Incident at Looney's Tavern" was performed only in the years 1995, 2000, 2001, and 2002.  Looney's Tavern's gross

ticket sales for performances of "Incident at Looney's Tavern" in 1995, 2000, 2001, and 2002, and resulting two percent (2%) royalty due to Plaintiff and Mary Alice Yarbrough, were as follows:

| Year | Gross Ticket Sales | 2% Royalty Paid |
|------|--------------------|-----------------|
| 1995 | $105,923.73 | $2,118.47 |
| 2000 | $ 35,743.43 | $ 714.86 |
| 2001 | $ 11,645.07 | $ 232.91 |
| 2002 | $ 21,511.13 | $ 430.22 |

*Id.* at ¶ 4.  The evidence is undisputed that these amounts were the gross ticket sale amounts, and that all such royalty payments, which constituted all royalties due under the Settlement and Release Agreement, were paid to Plaintiff and Mary Alice Yarbrough. *Id.* at ¶ 9.  Plaintiff, on page 23 of her "Motion for Leave of Court to File Third Supplemental and Amended Complaint," filed June 28, 2002, acknowledges receipt of royalty payments of $2,118 for 1995, $714.86 for 2000, and $232.91 for 2001.

### K.    Accounting

Section 1(d) of the Settlement and Release Agreement requires Looney's Tavern to allow Plaintiff's designated attorney or CPA to audit its books upon thirty (30) days notice.  Looney's Tavern has offered to allow Plaintiff's designated

attorney or CPA to audit its books upon thirty (30) days notice.  *March 22, 2001, Letter from Posey to Thompson*, at 2;  *May 9, 2001, Letter from Caprio to Thompson*, at 1.

### L.    Free State of Winston Heritage Association

Looney's Tavern has lost money on performances of "Incident at Looney's Tavern" and "Looney's Tavern: The Aftermath and the Legacy" from 1995-2002. *Moody Aff*. at ¶ 14.  Looney's Tavern receives some donations from the Free State of Winston Heritage Association which enables it to continue performing the plays despite its financial losses.  *Id*. at ¶ 14; *Farris Aff*. at ¶ 3.

The Free State of Winston Heritage Association ("Free State") is a non-profit corporation formed to promote tourism and to provide education and historical benefits for Winston County.  *Farris Aff*. at ¶ 1.  In 2000, Free State provided $91,200.00 in financial support to Looney's Tavern to help Looney's Tavern  pay utilities, office help, salaries, and production costs for performances of "The Incident at Looney's Tavern." *Id*. at ¶ 3.  Looney's Tavern made the ticket sales for all play performances and paid the sales tax to the State of Alabama.  *Id*.  In an effort to reimburse Free State for a portion of the donations it was receiving, Looney's Tavern paid to Free State the remaining balance of gate receipts minus sales tax.  *Id*.  During 2000, Looney's Tavern reimbursed Free State $33,720.22. *Id*.  Looney's Tavern was

responsible for producing and performing the plays, and Free State had no involvement in selecting the plays to be performed, the scripts to be used, selection of the play cast, or other input over the performances of the plays. *Id*. at ¶ 4.

### M. Jim Posey

Defendant Jim Posey is the current Chairman of the Board of Directors of Looney's Tavern Productions, Inc. Posey Aff. at ¶ 6. Posey has never been an officer or employee of Looney's Tavern and does not have the power, authority, or ability to supervise, exercise control over, or manage the day-to-day operations of Looney's Tavern, including what plays are performed. *Id*. at ¶ 4-6. Posey is one of thirteen members of the Board of Directors of Looney's Tavern, and his input as to Looney's Tavern's corporate policies is limited to one of thirteen votes by the Board of Directors. *Id*. at ¶ 6. Posey has never received any remuneration as a shareholder of Looney's Tavern. *Id*. at ¶ 9. Posey has, however, contributed a great deal of time to Looney's Tavern's operations at no charge. *Id*. at ¶ 8.

### N. Post 1995 "Freedom Run" Screenplay Activities

In the summer of 2000, Chester McKinney and Gary Goch invited Joseph Cohen, a business associate with whom they had worked on a previous film project, to visit Alabama to see the existing infrastructure of North Alabama as a potential production facility for the movie industry. *Goch Aff.* at ¶ 7; *Cohen Aff.* at ¶ 2. During

Cohen's visit, Goch informed him of the "Freedom Run" screenplay.  *Goch Aff.* at ¶
7; *Cohen Aff.* at ¶ 2.   Cohen, Goch, and McKinney traveled to Looney's
Entertainment Park and ate lunch.  *Id.* They only stayed a few hours and did not
attend any play performances.  *Id.*

Based on their existing relationship, and as a favor to Goch and McKinney,
Cohen volunteered to ask Bob Katz, a personal friend and producer of the movie
"Gettysburg," if Turner Network Television ("TNT") would be interested in another
Civil War project.  *Goch Aff.* at ¶ 8; *Cohen Aff.* at ¶ 3.  Goch gave Cohen a copy of
the "Freedom Run" screenplay, which Cohen gave to Katz.  *Goch Aff.* at ¶ 8; *Cohen
Aff.* at ¶ 3.  Within a few weeks, Katz informed Cohen that TNT was not interested,
and Cohen so informed Goch.  *Id.* No production plans exist and no money has been
raised for the "Freedom Run" screenplay.  *Goch Aff.* at ¶ 10; *Cohen Aff.* at ¶ 5; *Moody
Aff.* at ¶ 13.  Free State of Winston Heritage Association has not had any involvement
with the "Freedom Run" screenplay.  *Farris Aff.* at ¶ 8.  Neither Cohen, Goch, Jim
Posey, or Looney's Tavern have ever publicly displayed, publicly distributed, or
publicly performed the "Freedom Run" screenplay since at least 1997.  *Cohen Aff.* at
¶ 4; *Goch Aff.* at ¶ 9; *Posey Aff.* at ¶ 10; *Moody Aff.* at ¶ 13.  The last revisions to the
"Freedom Run" screenplay were made in 1995.  *Goch Aff.* at ¶ 9.

Posey is not aware of any production plans for the "Freedom Run" screenplay.

*Posey Aff*. at ¶ 11.  The only activity related to the "Freedom Run" screenplay since 1997 and involving Jim Posey was a visit by Gary Goch and Joseph Cohen to Looney's Tavern in the Summer of 2000. *Id.*

## IV.   SUMMARY JUDGMENT STANDARD

> Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Evidence is viewed in a light most favorable to the nonmoving party, *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437 (11th Cir.1991) (en banc); this, however, does not mean that we are constrained to accept all the nonmovant's factual characterizations and legal arguments. If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

*Beal v. Paramount Pictures Corp*., 20 F.3d 454, 458 -459 (11th Cir. 1994).

## V.   APPLICABLE LAW

### A.   <u>Test for Copyright Infringement</u>

To establish copyright infringement, a plaintiff must prove, first, ownership of a valid copyright and, second, copying of constituent elements of the work that are original. *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 361, 111 S. Ct. 1282, 1296, 113 L.Ed.2d 358 (1991).  To satisfy the first requirement of *Feist*, "'the Plaintiff must prove that the work as a whole is original and that the plaintiff complied with the applicable statutory formalities.'"  *MiTek Holdings, Inc.*

*v. Arce Engineering, Inc.*, 89 F.3d 1548, 1553-54 (11th Cir. 1996), *quoting Lotus Development Corporation v. Borland International, Inc.*, 49 F.3d 807, 813 (1st Cir. 1995).

*Feist*'s second requirement "'involves two separate inquiries: (1) whether the defendant as a factual matter, copied portions of the plaintiff's [work]; and (2) whether as a mixed issue of fact and law, those elements of the [work] that have been copied are protectable expression and of such importance to the copied work that the appropriation is actionable.'" *MiTek Holdings, Inc. v. Arce Engineering, Inc.*, 98 F.3d at 1554, *quoting Gates Rubber Company v. Bando Chemical Industries, Ltd.*, 9 F.3d 823, 832 (10th Cir. 1993). Stated differently, a defendant's work must be substantially similar to the plaintiff's protected expression. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994).

"When called upon to adjudicate a copyright dispute, a court must compare the works in question." *Beal v. Paramount Pictures Corp.*, 20 F.3d 454 (11th Cir. 1994). In copyright cases, "summary judgment is appropriate if (1) the similarity concerns only noncopyrightable elements or (2) no reasonable jury upon proper instruction would find the works substantially similar." *Id.* at 459.

Furthermore, "[F]or similarity to be substantial, and hence actionable, it must apply to more than simply a *de minimis* fragment." *See* 2 Melville B. Nimmer &

35

David Nimmer, NIMMER ON COPYRIGHT, 8-24, §8.01[G] (2002). "Ordinarily, the importance of but one line in plaintiff's work would be regarded as *de minimis*, not justifying a finding of substantial similarity." *See id.* at 13-50, §13.03[A][2].

**B.    Authors Who Represent That Their Work Is Factual Are Estopped From Claiming Work Is Fictional And Protectable**

Authors who make express representations that their work is "factual" are estopped from claiming fictionalization and therefore a higher level of protection. 1 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, 2-172.21, §2.11[C] (2002); *Houts v. Universal City Studios, Inc.*, 603 F.Supp 26 (C.D. Cal. 1984) (author estopped from claiming fictionalization after express representation work is factual).

**C.    The Copyright Act Does Not Protect Facts, Even If Discovered Through Original Research.**

No one may claim originality as to facts.  Facts may be discovered, but they are not created by an act of authorship.  One who discovers an otherwise unknown fact may well have performed a socially useful function, but the discovery as such does not render him an "author" in either the constitutional or statutory sense.

1 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, 2-172.16, §2.11[A] (2002); *see also Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1372 (5th Cir. 1981) (no protection for industrious collection); *Feder v. The Video Trip Corporation*, 697 F.Supp. 1165 (D. Colo. 1988) (no protection for real events discovered through original research).  "Notwithstanding that enormous effort and

great expense may have been required to discover factual information, it may, nonetheless, be freely taken from the original writer's copyrighted work and republished at will without need of permission or payment." *Craft v. Kobler*, 667 F.Supp. 120, 123 (S.D.N.Y. 1987); *see also Walker v. Time Life Films, Inc.*, 784 F.2d 44, 49 (2nd Cir. 1986), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986) (no copyright protection for facts discovered through original research).

### D.    Historical Works Are Due Only Very Limited Protection

[T]he protection afforded the copyright holder has never extended to history, be it documented fact or explanatory hypotheses. The rationale for this doctrine is that the cause of knowledge is best served when history is the common property of all, and each generation remains free to draw upon the discoveries and insights of the past. Accordingly, the scope of copyright in historical accounts is narrow indeed, embracing no more than the author's original expression of particular facts and theories already in the public domain. As the case before us illustrates, absent wholesale usurpation of another's expression, claims of copyright infringement where works of history are at issue are rarely successful.

*Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 974 (2nd Cir. 1980), *cert. denied*, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980).

One cannot build a story around a historical incident and then claim exclusive right in the use of the incident. If originality can be claimed in opposing Aguinaldo to Funston, as the plaintiff claimed in open court, then all the novels, short stories, and dramas written about the Civil War, opposing Grant and Lee, might never have been written after the first one because the author of the first one could have claimed exclusive right to the product.

*Echevarria v. Warner Bros. Pictures, Inc.*, 12 F.Supp. 632, 638 (S.D. Cal. 1935).

E.   **"Substantial Similarity" In Historical Works Must Relate To Protectable Subject Matter**

When dealing with historical works, "it is expected that there would result some similarity of treatment." *Eisenschiml v. Faucett Publications, Inc.*, 246 F.2d 598, 604 (7th Cir. 1957) (in historical writings, works necessarily writing about some personages during a very limited period of time). Evidence showing the duplication of historical facts and ordinary phrases does not raise a triable issue of fact. *Narrell*, 872 F.2d at 913.

Moreover, "because it is virtually impossible to write about a particular historical era or fictional theme without employing certain 'stock' or standard literary devices, we have held that *scenes a faire* are not copyrightable as a matter of law." *Hoehling* 618 F.2d at 979. "*Scenes a faire*," which is described as "sequences of events which necessarily follow from a common theme" or "incidents, characters, or settings that are indispensable or standard in the treatment of a given topic" are not copyrightable and not protectable. *Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1248 (11th Cir. 1999); *see also Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2nd Cir. 1986), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2778, 90 L.Ed.2d. 721 (1986) (no protection for common elements in police fiction, such as "drunks, prostitutes,

38

vermin and derelict cars" and "foot chases and the morale problems of policemen, not to mention the familiar figure of the Irish cop"); *Evans v. Wallace Berrie & Co.*, 681 F.Supp. 813, 817 (S.D. Fla. 1988) ("Such similarities as using a sand dollar as currency, foods made of seaweed, seahorses for transportation and places made of oysters or mother of pearl are not protected similarities of expression, but are more accurately characterizations that naturally follow from the common theme of an underwater civilization.")

## VI.    ANALYSIS[15]

As an initial matter, many of the claims asserted against McAlister and JennyMac involve the same time frame, fact scenario, counts, and alleged violations that were addressed by Judge Bowdre in her September 9, 2002, Order dismissing several claims.  Because of the similarities between the facts and claims, and for the reasons stated in such Order, the Court dismisses as to these Defendants the exact same claims that were dismissed as to the other Defendants by Judge Bowdre's order of September 9, 2002 (doc. 207).

---

[15]Importantly, the Plaintiff, in her response, does not specifically follow the format established by the Defendant's brief.  She also does not specifically address all of their contentions.  In addition, as to most of her arguments, the Plaintiff fails to specifically cite evidence in support of her contentions, cites evidence not properly before the Court, or cites evidence in such a manner that it is impossible for the Court to determine from where the assertion she makes comes.  Still, despite, the lack of clear argument, or evidentiary support, the Court, as is its duty, has untaken to ensure that summary judgment is granted in this matter *only* if due.

The claims include those in the following Counts:

•   Count IV, titled "State Law Claims–Unfair Trade Practices And Unfair Competition and Deceptive Trade Practices." *Third Amended Complaint*, at 47.  As Judge Bowdre correctly pointed out in her order, despite this title, the body of this Count only asserts claims under the ADTPA.  Only a "consumer" has standing to bring a claim under the ADTPA.  Ala. Code. § 8-19-10(a).  *EBSCO Industries, Inc. v. LMN Enterprises, Inc.*, 89 F. Supp. 2d 1248, 1266 (N.D. Ala. 2000).  A consumer is defined as "any natural person who buys goods or services for personal, family or household use." Ala. Code § 8-19-3(2).  Because Plaintiff has not bough any goods from McAlister and JennyMac, and therefore is not a "consumer" as defined in the ADTPA, she has no standing to bring these claims.

•   Count 6 asserts misconduct not on the part of Defendants McAlister and JennyMac, but instead on the part of Plaintiff's prior attorneys in the settlement agreement.

•   Count 9 asserts misconduct in a mediation held in 1995.  Any claim based on said mediation is barred by laches.

•   Count 10 seeks to prevent Looney's from disbursing funds.  It has

40

nothing to do with McAlister and JennyMac.

•   As to Count 1, the copyright claims against McAlister and JennyMac are subject to a three year statute of limitations period.  Accordingly, all claims under Count 1 that arose prior to May 11, 1998 (three years from the date they were originally sued) are barred.

•   As to Count 3, the Plaintiff has failed to plead a proper cause of action under RICO.  Those claims are due to be dismissed.  As to the Lanham Act claims, as Judge Bowdre's opinion points out, a one year statute of limitations would apply.  Accordingly, all Lanham Act claims against McAlister and JennyMac that arose prior to May 11, 2000, are barred. Indeed, the evidence is clear that *all* Lanham Act claims against McAlister and JennyMac are barred due to the fact that these Defendants' involvement with the plays in question ceased in 1998. *Hager deposition*, at 11, 37.  Plaintiff's Lanham Act claims regarding the Play "Looney's Tavern Aftermath and Legacy" are also barred by the doctrine of laches.

It is important to note that, on September 21, 2001, the affirmative defense of statute of limitations was raised in McAlister and JennyMac's initial Answers (docs. 69 and 70).  They also raised, in their affirmative defenses, the fact that Plaintiff is

41

not a "consumer".   In their motion for summary judgment, these Defendants again noted Judge Bowdre's order of September 9, 2002, and the Counts dismissed therein. *Brief in Support of Summary Judgment*, at 13, 15.   The Plaintiff specifically was aware of, and responded to, these statements by the Defendants. These defenses and positions are not a surprise to the Plaintiff.  She has had an opportunity to defend and brief them in front of Judge Bowdre, and was aware of these Defendants' positions regarding them.

Where legally identical claims have been dismissed on the motion of some defendants, the court may, *sua sponte*, dismiss those claims as to other, non-movant defendants.   *Stein v. Sands Hotel & Casino*, 810 F.Supp. 354, *359 (D.Puerto Rico,1992) (The court granted one defendant's motion to dismiss the plaintiff's claim as time-barred and *sua sponte* dismissed the action as to the codefendants); *DeVoren Stores, Inc. v. City of Philadelphia*, 1990 WL 10003, *10 (E.D.Pa.,1990)  ("Where motion for dismissal is granted as to one defendant it may be granted to another when the applicable basis in law applies to both. *See Thomas v. Southeastern Pennsylvania Transportation Authority,* No. 88-7846 (E.D.Pa. Feb. 9, 1989) (1989 WL 11222, LEXIS, Genfed library, Dist. file); *Washington Petroleum and Supply Co. v. Girard Bank,* 629 F.Supp. 1224 (M.D.Pa.1983).") The Plaintiff had full notice of, and an opportunity to respond to, the motions to dismiss filed by Defendants Looney's, Free

State, Goch, Cohen and Posey.  The legal premises for the Order dismissing the claims that this court is *sua sponte* dismissing as to Defendants JennyMac and McAlister are identical.  Therefore, *sua sponte* dismissal is appropriate.  *See*, *Washington Petroleum and Supply Company v. Girard Bank*, 629 F.Supp. 1224 at 1230 (M.D. Pa., 1983).

Specifically, this Court, *sua sponte*, will **DISMISS** all claims asserted against McAlister and JennyMac in Count IV, Count 6, Count 9, and Count 10.  As to Count One, as to Defendants McAlister and JennyMac, this Court will **DISMISS** all copyright claims that arose before May 11, 1998.  As to Count Three, against McAlister and JennyMac, this Court will **DISMISS** all RICO claims and all Lanham Act claims that arose prior to May 11, 2000.  Also, as to McAlister and JennyMac, all Lanham Act claims based upon the play "Looney's Tavern: Aftermath and Legacy" are barred and will be **DISMISSED**.  In support of this dismissal, the Court cites the reasoning in Judge Bowdre's Order, as well as the transcript of her hearing.  Said transcript has already been filed into the record by the Plaintiff and is hereby **ALLOWED** to the extent cited herein.

### A.  The Registration To Tories of the Hills Is Not Invalid for Fraud

The Defendants contend that the copyright registration to Tories of the Hills is invalid as a result of two fraudulent misrepresentations made to the U.S. Copyright

Office and that, pursuant to 17 U.S.C. § 411(a), this Court lacks subject matter jurisdiction over Plaintiff's copyright infringement claims related to this work. It is undisputed that the original copyright to this work was applied for and granted to The Christopher Publishing House in 1953. The application lists Wesley Thompson as the author. *Tories of the Hills Copyright Application*, at 1. At the Plaintiff's deposition, she stated that the book was copyrighted by Christopher Publishing House without her father's permission and that he had only hired that company to publish the book for him. *Thompson Deposition*, at 43-45. She also stated that the copyright was fraudulently registered by Christopher Publishing House. *Id.* The Defendants contend that registering a work in which the claimant has no copyrightable interest invalidates the copyright.

Under the 1909 Act, which applies to this case, a valid certificate of registration is *prima facie* evidence of ownership. Bruce Keller, et al., <u>Copyright Law: A Practitioner's Guide</u> §3:1, p. 3-2 (2002). The inference of ownership can be rebutted. *Id.* However, the burden is on the Defendants to show that the Christopher Publishing House did not have the right to register the copyright in this case. The only evidence the Defendants can cite to of that fact is the Plaintiff's own testimony as to her father's state of mind, intent, and statements regarding whether he agreed that the company could do so. None of these statements are admissible evidence for

44

summary judgment or other purposes.  Accordingly, there is a genuine issue of material fact as to whether Christopher Publishing House's obtaining of the Copyright was fraudulent.

The Defendants also contend that the application and registration misrepresented the identity of the authors of the work.  Specifically, they contend that "Plaintiff admitted in the 1994 lawsuit that Judge Weaver was, at the very least, a co-author of portions of the book, Tories of the Hills, yet he still does not appear on the registration as a co-author."  *Defendants' Initial Brief*, at 26-27.  Because Judge Weaver's name does not appear on the registration as a co-author, the argument goes, the registration was fraudulent and invalid.  After review of the evidence, there remains a genuine issue of material fact as to whether Judge Weaver was a co-author of the book, or whether Mr. Thompson wrote the book alone.  Again, the Defendants' only evidence of co-authorship is the Plaintiff's statements in a previous lawsuit, which could not be based upon her personal knowledge.  There remains a genuine issue of material fact as to whether Judge Weaver was a co-author of the book.

Neither one of the representations to the Copyright Office render the registration invalid.  The Court is not deprived of jurisdiction over Plaintiff's copyright claims based on Tories of the Hills.

**B.    The Copyrights to Tories of the Hills and Free State of Winston are Not Invalid Because Portions of the Works Were Not Original to Wesley Thompson**

**1.    Tories of the Hills**

The Defendants argue that even if the registration is not invalidated, the *prima facie* presumption of validity of the registration under § 410(c) of the Copyright Act is inapplicable because, they contend, the same portions of <u>Tories of the Hills</u> which Plaintiff claims were copied by Defendants were not original to Wesley Thompson but rather were copied from Judge Weaver.  In particular, the Defendants cite the neutrality convention resolutions, authored by Weaver, which they contend were copied by Thompson.  <u>*Tories of the Hills*</u>, at 46-47; <u>*Fact and Fiction of the Free State of Winston*</u>, at 7.  The passages are exactly the same.  Weaver's book appears to take the passage from yet another work by A.B. Moore entitled <u>The History of Alabama</u>, Vol. 1, p. 543.

Defendants also point to the fact that Thompson appears to have obtained his information related to the killing of Tom Pink Curtis and Andrew Kaiser and the raid of the Jasper jail from Judge Weaver.  *Weaver Dep.* at 34; *Weaver Notes,* at LT002667-LT002670; <u>*Tories of the Hills*</u>, at 146-151, 180-183.

The neutrality convention resolutions are historical fact.  They can be used by anyone.  Their quotation in a work does not bar a party from copyrighting the work

46

itself.  Likewise, Mr. Thompson could still copyright his work legally, despite consulting notes from Mr. Weaver and using the information contained therein in a different format.  The Defendants are not entitled to judgment as a matter of law based on Mr. Thompson's use of these materials.

### 2.    Free State of Winston

The Defendants contend that the *prima facie* presumption of validity of the registration under § 410(c) of the Copyright Act is also inapplicable for <u>Free State of Winston</u>.  Defendants cite the neutrality convention resolutions and exclamation by Uncle Dick Payne, the killing of Tom Pink Curtis and Andrew Kaiser, and the raid of the Jasper jail, as items copied from Judge Weaver.  For the same reasons cited above, Mr. Thompson could legally hold a copyright in <u>Free State of Winston</u>.

### C.    <u>Count 1</u>

Count I of the Complaint alleges that the following works infringe the Copyrighted Works: 1) Scripts and performances in 1996, 1997, 1998, and 1999 of the play "Looney's Tavern: the Aftermath and the Legacy"; 2) Scripts and performances in  2000, 2001, and 2002 of the play, "The Incident at Looney's Tavern"; and 3) The "Freedom Run" screenplay.

### 1.    <u>As to Defendants Looney's, Free State, Goch, Cohen, McAlister, and JennyMac All Claims That Arose Before May 11, 1998 Have Already Been , or Will Be Dismissed; As to</u>

47

**Defendant Posey, All Claims That Arose Prior to June 28, 1999 Have Already Been Dismissed**

In its Order of September 9, 2002, the Court dismissed, as to Defendants Looney's, Free State, Goch, and Cohen all copyright claims that arose before May 11, 1998, and the copyright claims against Jim Posey that arose prior to June 28, 1999. Accordingly, the only claims remaining in Count 1 as to Defendants Looney's Free State, Goch, and Cohen are claims based on: 1) Scripts and performances in 1998 and 1999 of the play "Looney's Tavern: the Aftermath and the Legacy"; 2) Scripts and performances in 2000, 2001, and 2002 of the play, "The Incident at Looney's Tavern"; and 3) The "Freedom Run" screenplay.  As to Defendant Posey, the only claims remaining in Count 1 are: 1) Scripts and performances in 1999 of the play "Looney's Tavern: the Aftermath and the Legacy"; 2) Scripts and performances in 2000, 2001, and 2002 of the play, "The Incident at Looney's Tavern"; and 3) The "Freedom Run" screenplay

**2.     Plaintiff's Copyright Claims Based on the 1998-1999 Plays Are Barred By Estoppel**

Plaintiff's claims based on the 1998-1999 plays are barred by estoppel.  The elements of estoppel in a copyright infringement action are: (1) the party to be estopped must know the facts of the defendant's infringing conduct; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the

48

estoppel has a right to believe that it is so intended; (3) the defendant must be ignorant of the true facts; and (4) he must rely on the plaintiff's conduct to his injury. *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100 (9th Cir. 1960).

### a.    The Plaintiff Knew the Facts of the Infringing Conduct

Plaintiff has admitted that she knew that Looney's was performing the play since 1996.

### b.    The Plaintiff Acted In Such a Way That the Defendants Had a Right to Believe That They Were Not Infringing

Plaintiff never informed Looney's that she thought the play was infringing. She contends that, in 1996, she told her lawyers in the 1994 suit that she felt the play was infringing. She claims she told them so both after she read the script and after seeing the play in 1996. She later contends that these gentlemen were not her attorneys and had no right to act for her, despite her repeated calls to them. Regardless, Attorneys Phillips and Eveline, Plaintiff's attorneys in the 1994 action, who had dealt with Looney's on Plaintiff's behalf in the past, contacted Looney's counsel and told them that the 1996 play script was not infringing.

### c.    Defendants Did Not Know That the Play Was Infringing

Not only was Looney's told by Plaintiff's counsel that the play was not infringing, the Plaintiff never informed it or the other Defendants otherwise.

Looney's Tavern did not know that Plaintiff thought the 1996 play was infringing and, on that basis, performed the play for the next four years.

> ### d. Defendants Relied on the Plaintiff's Assertions to Their Injury

The Defendants performed the play for four years thinking the Plaintiff had approved the play as non-infringing.[16] [17] [18]

> ### e. Estoppel Bars the Claims

Plaintiff's claims for performances in 1998-1999 are barred on the basis of estoppel. *Hayden v. Chalfant Press, Inc.*, 177 F.Supp. 303 (S.D. Cal. 1959), *affirmed*, 281 F.2d 543 (9th Cir. 1960). Moreover, Plaintiff may not assert rights in the future to the 1996 play should Looney's Tavern choose to perform the play again. *Id.*

> ### 3. The Claims Are Also Barred by License

While Plaintiff may assert that those attorneys had no authority to act for her, it is undisputed that Plaintiff's sister and co-owner of all copyrights, Mrs. Yarbrough, reviewed the 1996 script and agreed with her lawyers that it was non-infringing. It is also undisputed that Yarbrough's lawyers, who were also Plaintiff's lawyers at one

---

[16]Plaintiff acknowledges that since the scripts are substantially similar, the 1997 script would infringe, if at all, for the same reasons as the 1996 script. *Thompson Dep*. at 190.

[17]The 1998 script is very similar to the scripts for the 1996 and 1997 plays and contains the same plot, characters, locale, settings, and mood. *McAlister Aff*. at ¶ 10-11; *Plaintiff's Response to Interrogatories* #15.

[18]The 1999 script was the same as used in 1997 with only two minor changes. *Hager Dep*. at 23-24, 38.

time, communicated this approval to counsel for Looney's Tavern. "When the totality of the parties' conduct indicates an intent to grant such permission, the result is a legal non-exclusive license. . . ." 3 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, 10-48, § 10.03 [A][7] (2002).  Ms. Yarbrough's consent and permission alone granted Looney's Tavern a non-exclusive license to perform the 1996 play script–despite the feelings of the Plaintiff.  *See Lulirama Ltd., Inc. v. Axcess Broadcast Services, Inc.*, 128 F.3d 872, 879 (5th Cir. 1997) (non-exclusive license may be granted orally, or may even be implied from conduct).

A joint owner of a copyright, such as Ms. Yarbrough, may grant licenses to a jointly-owned work without the consent of the other joint owners.  1 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, 6-30, § 6.10 (2002); *see also Meridith v. Smith*, 145 F.2d 620, 621 (9th Cir. 1944).  A license is an effective defense to an infringement action brought by another joint owner.  NIMMER at § 6.10. Therefore, based on license, and the fact that the plays are nearly identical, the scripts and performances of the 1998-1999 plays are non-infringing.

### 4. Plaintiff's Copyright Claims Based On the 2000 Play Are Barred By License; The 2000 Play Does Not Infringe on Copyrighted Works

The 1995 Settlement and Release Agreement granted Looney's Tavern the right to use in future scripts and performances portions of the book Tories of the Hills

51

in the 1989-1995 scripts of the play, "Incident at Looney's Tavern." *1995 Settlement Agreement*, at Para 1(c).

The 2000 script for "Incident at Looney's Tavern," is identical in all material respects to the 1989, 1991, and 1993 scripts, with only minor and inconsequential changes. *Benson Aff*. at ¶¶ 3-8.  Under the 1995 Settlement and Release Agreement, Looney's Tavern was licensed to use the passages appearing in the 2000 script which correspond to passages in the 1989-1995 scripts.

There were only a few minor and inconsequential changes made to the 2000 script which have no corresponding passages in the 1989, 1991, or 1993 scripts. *Id.* at ¶ 4.  These changes are identified in Exhibit 1 to the affidavit of Margie Benson.[19] Except as described below, these "new" passages were neither copied from nor

---

[19] While a large majority of the 2000 script text is identical to the passages in the 1993, 1991, and 1989 scripts, a few passages contain extremely minor and inconsequential alterations and are not included in Exhibit 1 to Benson's affidavit. Examples of the type of text changes not included in Exhibit 1 are:

2000 Script, Pg. 1, ln 37:  Narrator: "I'm a comin back to help you keep up with this here story."

1991 Script, Pg. 2, ln 5:  Narrator: "So I'm a coming back to keep you straightened out."

2000 Script, Pg. 5, ln 9:  Thelma Lou: "Say, have you been hearing anything 'bout Mariah Kaiser and Young Jim Bell?"

1991 Script, Pg. 4, ln 39:  Thelma Lou: "Have you been hearing anything 'bout Cherry Kaiser and Chris Sheets?"

2000 Script, Pg. 7, ln 7:  Curtis: "Doc, you're wrong about secession!  Ain't no cause for Alabama to jest pull up stakes and leave out of the Union!"

1991 Script, Pg. 7, ln 1:  Curtis: "Doc, you're wrong!  Ain't no cause to just pull up stakes and leave out!!!"

"substantially similar" to the Copyrighted Works. *Id.* at ¶¶ 5-8. Indeed, the author of the 2000 script changes, Margie Benson, has not even read So Turns the Tide or Free State of Winston.

The only "new" passage in the 2000 script which also appears in one of the works, Tories of the Hills, is the following single sentence: "His associates had, for a time, recognized in him the possibility of a leader and were already looking to him for advice in the economical and political questions of his country." *Id.* at ¶ 6. This text appears on page 3, line 11 of the 2000 script to "Incident at Looney's Tavern," and on page 12 of Tories of the Hills. *Id.* at ¶ 6.

Other than that passage, which was identified originally by Defendants, Plaintiff identified fourteen passages in the 2000 play script which she claims constitute copyright infringement. *Response #2, to Defendants' Interrogatories*. All of the passages identified by Plaintiff appeared in one form or another in the 1989-1995 play scripts and are therefore licensed pursuant to the 1995 Settlement and Release Agreement. *Report of Don Dodd* at 11-18. Plaintiff also claims that the 2000 play and Tories of the Hills both include a "wrap-up," but does not identify what protectable expression was allegedly taken from Tories of the Hills. *Response #2, to Defendants' Interrogatories*. Plaintiff does identify two sentences in the play, but does not state if they were allegedly copied from any of the Copyrighted Works. In

53

any event, these two passages appeared in the 1993 play, and were therefore licensed pursuant to the 1995 Settlement and Release Agreement.

Plaintiff also apparently relies on the allegedly similar depiction of Chris Sheets's conduct at the Secession Convention for proof of copyright infringement. *Id.* That depiction, even if infringing, was the same in the 2000 script as it was in the 1989-1995 scripts, and was therefore licensed. Moreover, if Plaintiff alleges any similarity in the plot, characters, locale, sequence, and mood, this too is insufficient because these similarities stem from the 1989-1995 scripts, not the minor alterations made in 2000, and are therefore licensed.

Plaintiff claims that both the play and Tories of the Hills compare life in South Alabama, with the mansions and fancy way of life, with the plain hills of North Alabama. *Id.* The contrasting of Montgomery with a plainer way of life is not only an unprotectable idea, but also constitutes *scenes a faire*, i.e., an indispensable scene when comparing the ideology of the Winston County residents that opposed secession with the pro-slavery stance of the southern part of the State of Alabama. In summary, only a single sentence in the 2000 script bears any similarity to Tories of the Hills. There is no evidence of any copying or similarity to Free State of Winston or So Turns the Tide. This single sentence is simply background information on one character and is not of such importance to Tories of the Hills that the appropriation

54

is actionable.  It is simply one line in a work over 270 pages long.  The "substantial

similarity" test is simply not met when one, inconsequential passage is used.  *See*

*Toulmin v. Rike-Kumler Co.*, 137 U.S.P.Q. 533, 1962 U.S. Dist. LEXIS 4454 (S.D.

Ohio 1962), *affirmed*, 316 F.2d 232 (6th Cir. 1963), *cert. denied,* 375 U.S. 825, 84

S.Ct.66, 11 L.Ed.2d 58 (1963)(copying of a sentence and a half from a book of 142

pages held *de minimis*); *Vault Corp. v. Quaid Software Ltd.,* 847 F.2d 255, 267 (5th

Cir. 1988) (30 characters out of 50 pages of source code held *de minimis*); *Rokeach*

*v. Avco Embassy Pictures Corp.*, 197 U.S.P.Q. 155, 1978 U.S. Dist. LEXIS 20101

(S.D.N.Y. 1978) (copying 100 words out of a total of 70,000 held *de minimis*).

For these reasons, the 2000 script is non-infringing and Defendants are entitled

to Summary Judgment as to all claims based on the 2000 script.  *See* 2 Melville B.

Nimmer & David Nimmer, NIMMER ON COPYRIGHT, 13-51, § 13.03[A] [2]

(2002)("[I]t is most unusual for infringement to be found on the basis of similarity of

a single line, and generally, the likelihood of copying but a single line of such

importance, as to warrant a finding of substantial similarity, is remote.").

### 5. Judgment As a Matter of Law Is Also Due on Plaintiff's Copyright Claims Based On 2001 And 2002 Play

The 1993 and 2001 scripts are the same. The 2001 script (i.e., the 1993 script)

was also used for the 2002 season. *Moody Aff*. ¶ 3.  Because Looney's Tavern was

licensed in the Settlement and Release Agreement to use in future scripts any portions of <u>Tories of the Hills</u> found in the 1989-1995 scripts, and the 2001 and 2002 script were identical to the 1993 script, the 2001 and 2002 scripts and performances are non-infringing, and Plaintiff's claims based on these works are without merit.

### 6.    Summary Judgment Is Appropriate As to Plaintiff's Claims Against Free State of Winston Heritage Association For Play Scripts and Performances

Even if Summary Judgment were not Appropriate as to Free State for the reasons stated above, it would be due because of the undisputed evidence that from 1998-2002 Free State: (1) did not produce or perform the plays; (2) did not have any input or control over the plays; (3) did not select which plays to perform or on what days plays were to be performed; and (4) did not employ or pay the directors or actors and actresses. *Farris Aff*. at ¶ 4.

### 7.    Summary Judgment Is Appropriate As to Plaintiff's Claims Against Jim Posey For Play Scripts and Performances

Likewise, as to Posey, even if Summary Judgment were not appropriate for the reasons stated above, it would be appropriate as to Mr. Posey because it is undisputed that from 1999-2002 he: (1) was not an officer or employee of Looney's Tavern; (2) did not have the ability to supervise, exercise any control over, or manage the day-to-day operations of Looney's Tavern, or select the plays to be performed; and (3) has

not received any financial remuneration from Looney's Tavern. *Posey Aff.* at ¶ 4-6, 8.

**8.    Summary Judgment Is Due to Be Granted As to Plaintiff's Copyright Claims Based On "Freedom Run" Screenplay**

**a.    As to All Defendants**

As an initial matter Plaintiff's "Freedom Run" claims are also due to be dismissed on the basis of laches. Plaintiff has known of Defendants' alleged plans to make a movie since 1992, yet waited until May of 2001 to file this lawsuit. Plaintiff is equitably estopped from now claiming that Defendants' conduct is infringing. Plaintiff's delay is inexcusable and prejudicial to the Defendants and therefore barred by laches. *Silva v. MacLaine*, 697 F.Supp. 1423, 1430-31 (E.D. Mich. 1988), *affirmed*, 888 F.2d 1392 (6th Cir. 1989), *cert. denied*, 495 U.S. 905, 109 L.Ed.2d 289, 110 S.Ct. 1925 (1990).

In addition, even if laches did not apply, the Freedom Run screenplay does not infringe upon the Copyrighted Works. The uncontroverted testimony of the authors, Lanny McAlister and Gary Goch, is that none of the "Freedom Run" screenplay was copied from, is substantially similar to, or relied upon any protectable subject matter from the Copyrighted Works. *McAlister Aff.* at ¶ 5; *Goch Aff.* at ¶ 5. There is only one passage included in the "Freedom Run" screenplay, identified originally by

Defendants, that is somewhat similar to a passage appearing in <u>Tories of the Hills</u>.

(McAlister Aff. ¶ 6.)   The screenplay contains the following passage:

> "Mr. Yancy, I came here as a citizen of the United States of America. .
> . . I don't have to sign anything to make me a citizen of my country."

<u>Freedom Run</u>, at Bates No. GG000060, while page 30 of <u>Tories of the Hills</u> contains

the following passage:

> "I came here as a citizen of the State of Alabama of the United States,
> and I don't have to sign anything to make me one."

Even if Plaintiff could prove that the sentence was copied, it is <u>not</u> of such

importance to <u>Tories of the Hills</u> that the appropriation is actionable.  This is but one

line in a work over 270 pages long.  The "substantial similarity" test is simply not met

when one inconsequential passage is used.  *See Toulmin v. Rike-Kumler Co.*, 137

U.S.P.Q. 533, 1962 U.S. Dist. LEXIS 4454 (S.D. Ohio 1962), *affirmed*, 316 F.2d 232

(6th Cir. 1963), *cert. denied*, 375 U.S. 825, 84 S.Ct.66, 11 L.Ed.2d 58 (1963)(copying

of a sentence and a half from a book of 142 pages held *de minimis*); *Vault Corp. v.*

*Quaid Software Ltd.,* 847 F.2d 255, 267 (5th Cir. 1988) (30 characters out of 50 pages

of source code held *de minimis*); *Rokeach v. Avco Embassy Pictures Corp.*, 197

U.S.P.Q. 155, 1978 U.S. Dist. LEXIS 20101 (S.D.N.Y. 1978) (copying 100 words out

of a total of 70,000 held *de minimis*); *Werlin v. Reader's Digest Association, Inc.*, 528

F. Supp. 451 (S.D.N.Y. 1981) (copying two sentences held *de minimis*).

Plaintiff also relies on the following list of what she characterizes as "similarities" between the Copyrighted Works and the "Freedom Run" screenplay: (1) events take place in the same locales; (2) same settings; (3) same relevant factors; (4) same plot; (5) same theme; (6) same characterization; (7) same places; (8) same mood except for "trite stuff and chewing the fat stuff"; and (9) same pace, except for the "trite stuff and chewing the fat stuff". *Response #3 to Defendants' Interrogatories*. Lists of "similarities" alone are insufficient on which to find copyright infringement. *Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1257 (11th Cir. 1999).

Plaintiff claims both works include scenes at Looney's Tavern, the town of Houston, the Sheets farmhouse, and Montgomery. These locations are unprotectable historical places and would be indispensable in any story detailing the account of Winston County during the Civil War. Moreover, Plaintiff can not claim similarity in protectable expression of these locations.

Plaintiff claims the screenplay and Copyrighted Works contain the same sequence of events, such as the presidential election, Winston County electing Sheets as a representative, Sheets going to the Secession Convention, the Neutrality Convention at Looney's Tavern, and the jailing of Sheets. As historical occurrences, there are very limited ways in telling the story, i.e., in chronological order. The

repetition of these events in the screenplay are not infringement.

Plaintiff also relies on the following similar "incidents" in the screenplay and the Copyrighted Works: the killing of Tom Pink Curtis, the killing of Andrew Kaiser, the burning of the jail, Union encampments, and scenes with Home Guards. Plaintiff's claims fail for the same three reasons Plaintiff's claims related to the 1996 play failed: (1) all these incidents are historical incidents, not the creation of Wesley Thompson; (2) the incidents naturally flow from and are indispensable to telling the history of Winston County during the Civil War; and (3) the expression used to describe these "incidents" is very different between the screenplay and the Copyrighted Works.  Plaintiff also relies on the debates between Kaiser and Sheets appearing in the screenplay and Tories of the Hills, but does not identify any similarity in the expression of these events. *Thompson Dep.* at 239.  Moreover, Free State of Winston provides the historical evidence that "heated debates over the secession issue" were taking place during this time period and that, as a matter of history, Kaiser ran against Sheets as the secession candidate for Winston County. The idea of a debate between two opposing candidates is not only an unprotectable idea, but is also a scene that naturally flows from the historical fact of an election campaign.

Plaintiff also claims that similar characters exist in both works, such as the use

of the historical character, Chris Sheets.  Wesley Thompson, however, described

Chris Sheets as "indispensable" to any history of Winston County and the use of this

character in telling the history of Winston County is not protectable.  Moreover,

Plaintiff admits that the screenplay's portrayal of Chris Sheets is very different from

that of the Copyrighted Works.  *Id*. at 240-241.  Plaintiff also relies on the character

"Cherry Kaiser" in the screenplay and "Cherry Parker" in <u>Tories of the Hills</u> but does

not demonstrate a substantial similarity between the two characters, other than their

first names.  Plaintiff also references the use of John Walker in the screenplay and

Bill Walker in <u>Tories of the Hills</u>, but again fails to demonstrate a substantial

similarity between the two characters.

Plaintiff also claims the screenplay and Copyrighted Works contain the same

plot and theme, but states that "Freedom Run" has no theme.  *Id*. at 239-40.  The only

similarity in plot between the works identified by Plaintiff was "a southern belle in

love with a Union sympathizer."  *Id*. at 239-40.  This generic plot is nothing more

than an unprotectable idea.

Plaintiff also claims that the pace of the works are similar except for the "trite

stuff and chewing the fat stuff."  Plaintiff states that <u>Tories of the Hills</u> moves "very

fast" and has lots of characters and "lots and lots of events."  The pace of the

screenplay, on the other hand, is slow.  For example, it is not until page 63 that the

Secession Convention is over (compared to page 34 of <u>Tories of the Hills</u>.)   The
majority of the screenplay focuses on Chris Sheets and his love affair with William
Lowndes Yancy's daughter, while <u>Tories of the Hills</u> only involves Chris Sheets
through the Secession Convention and the Neutrality meeting at Looney's Tavern, a
small part of the book.

Because Plaintiff cannot meet *Feist*'s second requirement, i.e., that there is
copying or "substantial similarity," the "Freedom Run" screenplay is non-infringing.
Summary Judgment is due to be granted as to Plaintiff's infringement claims based
on the "Freedom Run" screenplay.  *See* 2 Melville B. Nimmer & David Nimmer,
NIMMER ON COPYRIGHT, 13-51, §13.03[A] [2] (2002)("[I]t is most unusual for
infringement to be found on the basis of similarity of a single line, and generally, the
likelihood of copying but a single line of such importance, as to warrant a finding of
substantial similarity, is remote.").

**b.     Plaintiff's Specific Claims Against Free State of
Winston Heritage Association**

Even if Summary Judgment were not appropriate for the reasons stated above,
Summary Judgment should be granted as to Plaintiff's claims against Free State of
Winston Heritage Association because it is undisputed that Free State had no
involvement whatsoever with the "Freedom Run" screenplay. *Farris Aff.* at ¶ 9.

62

### c.   Plaintiff's Specific Claims Against Looney's Tavern and Jim Posey

Again, assuming Summary Judgment were not appropriate for the reasons stated above, the claims against Looney's Tavern and Jim Posey are ripe for Judgment as a Matter of Law.  Even if the "Freedom Run" screenplay were found infringing, there is no evidence that Looney's Tavern or Jim Posey have violated any of the exclusive copyright rights under 17 U.S.C. § 106 by publicly displaying, publicly distributing, publicly performing, creating derivative works, or making copies of the "Freedom Run" screenplay.  Moreover, there is no evidence of any production plans or money being raised for the project. Further, there is no evidence that Posey had the ability to supervise any activity related to the "Freedom Run" screenplay.  It is undisputed that, in 1995, Plaintiff released all then existing claims against Looney's Tavern pursuant to the 1995 Settlement and Release Agreement and, since 1997, the only activity related to the "Freedom Run" screenplay involving Looney's Tavern or Jim Posey was a visit in the Summer of 2000 to Looney's Entertainment Park by Gary Goch, a co-author of the screenplay, and Joseph Cohen.

### d.   Plaintiff's Specific Claims Against Joseph Cohen

If Summary Judgment were not appropriate for the reasons stated above, Summary Judgment should still be granted as to the claims against Cohen because it

is undisputed that Cohen's only involvement with the "Freedom Run" screenplay is a visit in the Summer of 2000 to Looney's Entertainment Park with Gary Goch, a co-author of the screenplay, and his providing a copy of the screenplay to a friend for consideration by TNT. Even if the "Freedom Run" screenplay were found infringing, there is no evidence that Cohen violated any of the exclusive copyright rights under 17 U.S.C. § 106 by publicly displaying, publicly distributing, publicly performing, creating derivative works, or making copies of the "Freedom Run" screenplay. There is no evidence of any production plans or money being raised for the project. Indeed, Plaintiff's allegations against Cohen for "marketing and raising money and scouting filming locations" and "trying to find a director/producer" do not state claims under the Copyright Act.

### e.     <u>Plaintiff's Specific Claims Against Gary Goch</u>

In addition to the reasons discussed above, Summary Judgment is appropriate as to Plaintiff's claims against Gary Goch ("Goch") because of the undisputed evidence that Goch's only involvement with the "Freedom Run" screenplay since 1997 was a visit in the Summer of 2000 to Looney's Entertainment Park with Cohen, and his providing a copy of the screenplay to Cohen for submission to a friend for consideration by TNT. Even if the "Freedom Run" screenplay were found infringing, the undisputed evidence is that Goch has not violated any of the exclusive copyright

rights under 17 U.S.C. § 106 because he has never publicly displayed, publicly distributed, or publicly performed the "Freedom Run" screenplay and the last modifications to the screenplay were made in 1995. Moreover, there is no evidence of any production plans or of money being raised for the project. Indeed, Plaintiff's claims that Goch co-authored "Freedom Run" in 1992 is barred by the statute of limitations, and Plaintiff's claims of "marketing and raising money" and "entering into contracts" in 1992 do not state claims under the Copyright Act.

### 9.   **McAlister and JennyMac**

All claims made as to these Defendants in 1999 or thereafter are also barred because there is no evidence that these Defendants had any connection with Looney's or the plays during that time.

### 10.   **Conclusion**

For the above stated reasons, there is no genuine issue of material fact as to the Plaintiff's claims in Count 1 of the Complaint. The Defendants are entitled to Judgment as a Matter of Law as to Count 1. Accordingly, the Motion for Summary Judgment will be **GRANTED** as to that Count, and Judgment will be **ENTERED** in favor of the Defendants.

### D.   **Count 2**

Count II of Plaintiff's Third Supplemental and Amended Complaint alleges

that Looney's Tavern breached the 1995 Settlement and Release Agreement by: 1) Making preparations for a movie when movie rights to <u>Tories of the Hills</u> is reserved to Plaintiff; 2) Generating and performing "Looney's Tavern: The Aftermath and the Legacy" from 1996-1999 when sequel rights and dramatic rights to <u>Tories of the Hills</u> is reserved to Plaintiff; 3) Failing to pay Plaintiff and her sister (Mary Alice Yarbrough) 2% royalties of gross ticket sales for performances of "Incident at Looney's Tavern"; 4) Failing to keep full and correct books relating to performances of "Incident at Looney's Tavern"; and 5) Transferring to Free State the non-exclusive license obtained pursuant to the 1995 Settlement and Release Agreement.

Paragraph 1(c) of the 1995 Settlement and Release Agreement states in pertinent part that, "Thompson and Yarbrough hereby reserve to themselves, including but not limited to, dramatic, all print publication, radio, television, cable, pay television, motion picture, photo play, sound recording, "live" broadcast and transmissions, sequel and serial rights in and unto the Book, [<u>Tories of the Hills</u>]." It is only movie rights, sequel rights, and dramatic rights to <u>Tories of the Hills</u>, <u>not</u> the play "The Incident at Looney's Tavern" or even the historical story of Winston County during the Civil War, to which Plaintiff is entitled. Only if Looney's Tavern infringed the copyright rights to <u>Tories of the Hills</u> would Looney's have breached the contract.  For the same reasons discussed above, however, Looney's has not

committed copyright infringement. Accordingly, Plaintiff's breach of contract claims on these counts must fail as well.

Summary judgment is also appropriate as to Plaintiff's breach of contract claims for unpaid royalties as it is undisputed that Plaintiff and her sister have been paid the 2% of the gross ticket sales for performances of the play "Incident at Looney's Tavern" in 1995, 2000, 2001, and 2002. *Moody Aff.* ¶ 5, 10.

Summary Judgment is also appropriate as to Plaintiff's breach of contract claims for Looney's Tavern's purported transfer of the license obtained pursuant to the 1995 Settlement and Release Agreement because there is no evidence such transfer occurred.

There is no evidence that Defendants have failed to keep proper books.

For the above stated reasons, there is no genuine issue of material fact as to the Plaintiff's claims in Count 2 of the Complaint. The Defendants are entitled to Judgment as a Matter of Law as to Count 2. Accordingly, the Motion for Summary Judgment will be **GRANTED** as to that Count, and Judgment will be **ENTERED** in favor of the Defendants.

### E.    Count 3

In its Order of September 9, 2002, the Court dismissed all Lanham Act claims that arose prior to May 11, 2000, and the Lanham Act claims against Jim Posey that

arose prior to June 28, 2001.  It also dismissed all RICO claims in this count.

Plaintiff claims in Count III of her Third Supplemental and Amended Complaint that

Defendants have violated § 43(a) of the Lanham Act by: 1)  Passing off McAlister as

the author, creator, and researcher of the play "Looney's Tavern: the Aftermath and

the Legacy" rather than attributing credit to Wesley Thompson, author of the

Copyrighted Works; 2) Implying Wesley Thompson's endorsement for the play

"Looney's Tavern: The Aftermath and the Legacy"; 3) Passing off McAlister and

Goch as the authors of the screenplay "Freedom Run" rather than attributing credit

to Wesley Thompson, author of the Copyrighted Works; 4) Marketing the "Freedom

Run" screenplay as if Defendants owned all rights to the screenplay; and 5)

Disparaging the good name of Wesley Thompson by performing trite plays that the

public associates with Thompson.

The only play performed within one year of the filing of Plaintiff's claim is

"Incident at Looney's Tavern."  No Lanham Act claims can be made as to McAlister

or JennyMac for that play there is no evidence that these Defendants had any

connection with Looney's, or the plays during that time.

Looney's Tavern was licensed by Plaintiff to use portions of Tories of the Hills

in t"Incident at Looney's Tavern" and such use cannot form the basis of Plaintiff's

Lanham Act claims for "reverse passing off" or disparagement.  NIMMER ON

COPYRIGHT § 8D.03[A][1] (2002) (prevailing view has been that an author who licenses work does not have an inherent right to be credited as author).  Moreover, even in the absence of the license, a claim for reverse passing off does not lie unless the plaintiff's work has been bodily appropriated.  *Cleary v. News Corp.*, 30 F.3d 1255, 1261 (9th Cir. 1994).  As explained above with respect to the copyright claims, Plaintiff has not and cannot make such a showing.

Summary Judgment is appropriate as to Plaintiff's Lanham Act claims related to the "Freedom Run" screenplay for multiple reasons.  First, because the screenplay was not authored by Wesley Thompson or substantially similar to the Copyrighted Works, Thompson has no claim to be credited as the author.  *Kennedy v. National Juvenile Detention Association*, 187 F.3d 690, 696 (7th Cir. 1999) (the two situations in which authors may file Lanham Act claims are (1) to ensure that his name is associated with a work when his work is used, known as a "reverse passing off"; or (2) when an author, whose name is associated with a given work, does not want to be associated with that work, known as a "passing off.").

Second, there is no evidence that any allegedly false or misleading "representations" related to the "Freedom Run" screenplay were made "in interstate commerce," as required by the Lanham Act.  Indeed, the only limited representations made regarding the "Freedom Run" screenplay, as acknowledged by the Plaintiff,

69

were made to or by Joseph Cohen, Gary Goch, Jim Posey, and Chester McKinney. There is no evidence of any commercial advertising or promotion of the "Freedom Run" screenplay to the general public. Third, there is absolutely no evidence of any likelihood of confusion about any representations purportedly made by Defendants related to the "Freedom Run" screenplay. For those reasons, Summary Judgment is appropriate as to Plaintiff's Lanham Act claims.

All other allegations and claims made by Plaintiff under Count 3 are either claims that Plaintiff has no standing to bring, or are pre-empted, or are completely without merit.

For the above stated reasons, there is no genuine issue of material fact as to the Plaintiff's claims in Count 3 of the Complaint. The Defendants are entitled to Judgment as a Matter of Law as to Count 3. Accordingly, the Motion for Summary Judgment will be **GRANTED** as to that Count, and Judgment will be **ENTERED** in favor of the Defendants.

## F.   <u>Count 5</u>

Plaintiff's claims for declaratory relief that, *if* Defendants produce a movie based in any way on "Incident at Looney's Tavern" or the Copyrighted Works, Defendants will owe punitive damages, are unripe. Even if they were not, punitive damages are not recoverable in a copyright infringement lawsuit.

For the above stated reasons, there is no genuine issue of material fact as to the Plaintiff's claims in Count 5 of the Complaint.  The Defendants are entitled to Judgment as a Matter of Law as to Count 5.  Accordingly, the Motion for Summary Judgment will be **GRANTED** as to that Count, and Judgment will be **ENTERED** in favor of the Defendants.

### G.    Count 7

This Count concerns the alleged fraudulent suppression of the "Freedom Run" screenplay. Plaintiff has offered no evidence why a duty to disclose the "Freedom Run" screenplay exists, or in what way Defendants' alleged suppression induced the Plaintiff to act to her detriment.  Summary Judgment, accordingly, is appropriate. *See Interstate Truck Leasing, Inc. v. Bender*, 608 So.2d 716 (Ala. 1992).  Also, the evidence demonstrates that Plaintiff was aware of Looney's Tavern's movie plans back in 1993.  Plaintiff claims one of the purposes of the 1994-1995 lawsuit was to keep Looney's Tavern from proceeding with a movie.  Also, because the "Freedom Run" screenplay did not infringe any of the Plaintiff's Copyrighted Works, there was no duty to disclose the existence of the non-infringing screenplay.

For the above stated reasons, there is no genuine issue of material fact as to the Plaintiff's claims in Count 7 of the Complaint.  The Defendants are entitled to Judgment as a Matter of Law as to Count 7.  Accordingly, the Motion for Summary

Judgment will be **GRANTED** as to that Count, and Judgment will be **ENTERED** in favor of the Defendants.

### H.    <u>Count 8</u>

Summary Judgment is appropriate as to Plaintiff's claims that Looney's Tavern and Free State refused to account for proceeds from the play.  Free State did allow Plaintiff to review its records for the year 2000, despite the fact that it appears it had no duty to do so.  Looney's Tavern repeatedly informed Plaintiff that, pursuant to the 1995 Settlement and Release Agreement, her designated CPA or attorney was entitled to review the books.  She has apparently not taken advantage of that entitlement.

For the above stated reasons, there is no genuine issue of material fact as to the Plaintiff's claims in Count 8 of the Complaint.  The Defendants are entitled to Judgment as a Matter of Law as to Count 8.  Accordingly, the Motion for Summary Judgment will be **GRANTED** as to that Count, and Judgment will be **ENTERED** in favor of the Defendants.

## VII.  CONCLUSION

Upon review of the submissions and evidence in this case, there is no genuine issue of material fact and the Defendants are entitled to judgment as a matter of law. Accordingly, by separate order Summary Judgment will be **GRANTED** as to all

remaining Counts in the Complaint.

**DONE** and **ORDERED**, this 25th day of August, 2005.

**VIRGINIA EMERSON HOPKINS**
United States District Judge